## Patton, Appellant, *v.* Franc.

Argued April 25, 1961.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Milford J. Meyer,* for appellants.

*James Rutherford,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 27, 1961:

Alviena Patton, ten years of age, was grievously injured when her sled was struck by an automobile operated by Charles Franc in Honesdale, Wayne County on January 18, 1958. Through her father Rendell Patton (who joined her as plaintiff in his own right) she brought a suit in trespass against Franc. At the ensuing trial the jury returned a verdict for the defendant. Upon the refusal of the trial court to grant a new trial, the plaintiffs appealed.

The main factual issue in the case was whether, as the defendant contended, the child rode her sled down a hill into Ridge Street, crossing it and running into the rear left side of his car which was proceeding northwardly on that street, or whether, as the plaintiffs maintain, the defendant came over to his wrong or left side of the highway and struck the child as she sat on her sled on the sidewalk on the west side of Ridge Street. The only eyewitness to the accident aside from the injured child and the defendant, was a thirteen-year-old girl Marilyn Smith. The defendant argues in this appeal that Marilyn Smith unequivocally testified that Alviena on her sled "came down the driveway, entered the street without stopping, and came into collision with the rear portion of defendant's car at a point just in front of the rear wheel."

The trial judge was also of this view and instructed the jury: "If you believe that the accident happened in the manner testified to by Marilyn Smith, then your verdict must be for the defendant."

It is a rare case where the court can direct the jury to found its verdict on the testimony of one witness, regardless of the other evidence in the case. This is certainly not that case. Marilyn's testimony was not so mathematically certain and not so devoid of blemish, contradiction or ambiguity that the jury could sit in the sleigh of her recollection and ride with conscien-

tious assurance to an impeccable verdict. As a matter of fact, there were many contradictions and flaws in her testimony.

Did Alviena's sled traverse Ridge Street from the west to the east side and run into the defendant's car on the east side, or did Franc drive over to the west side and run over Alviena's sled with her on it? Alviena testified that she was coasting down the hill on a driveway which exited into Ridge Street. Half way down the hill, her little brother, who was sitting behind her on the sled, jumped off and she continued on to the sidewalk, on her side of Ridge Street. When she stopped, her sled projected out over the edge of the sidewalk from 1 to 2 feet.

She said she could go no further because there was no snow on the street. It appears that there wasn't even much snow on the hillside itself. Enamored of sled-riding, Alviena, like so many of her little comrades throughout the world where snow periodically appears, sought to extract from the waning sled-riding season every little last ride which could be managed over the patches of snow still decorating the landscape. The street was not only barren of snow, it was covered with cinders so that the smooth surface needed to give trackage to the sled was missing.

Alviena had made five trips down the hillside each one of which terminated at the curb. On this last ride, as she reached the sidewalk, she saw the defendant's car on the east side of the street about 50 feet away. She turned her head to see where her little brother might be and, having assured herself that he was all right, she looked into the street again and this time noticed that the defendant's car was 15 feet away. The third time she looked he was only six inches away on his wrong side of the street, and in the following instant she lost consciousness.

The defendant told a completely different story. He said that he was driving on his side of the road and he saw no one on the road. Suddenly he felt a bump against the left rear side of his car and then he felt his car passing over an obstacle. He said he traveled 25 or 30 feet before he "even touched the brakes," and that when he came to a stop he saw the child lying in the roadway.

Which version of the accident represents what actually occurred? Naturally it was for the jury to decide that question. Into the deliberation of that question came Marilyn Smith, a thirteen-year-old girl who said that she was standing at the top of the hill when the accident occurred. The defendant and the trial judge, as already indicated, are of the impression that Marilyn's account of what happened confirmed what the defendant said. In its opinion refusing a new trial, the court said: "Marilyn Smith, the only eye-witness to the accident besides Alviena Patton and Charles Franc, corroborated the testimony of Charles Franc as to how the accident happened. Three times she said that Alviena ran into the back part of the Franc car. If the jury believed that version of the accident, which they evidently did, then they should bring in a verdict for the defendant, as there would be no negligence shown on the part of the defendant."

This statement reveals the lower court's unawareness of Marilyn's testimony. Marilyn did not corroborate Franc's testimony as to where, geographically, the accident occurred. She did say that the left rear of Franc's car and Alviena's sled came into contact with each other but she did not at any time say that Alviena's sled traversed the street and struck Franc's car on the east side of the road. On the contrary, she said several times that Alviena's sled was partly on the sidewalk at the time of the collision. If any part of Alviena's sled occupied the sidewalk at the time of the

impact, the collision could not have occurred on the east side of the street.

Marilyn confirmed what Alviena said about the street's being unsuitable for sledriding: "Q. You knew you couldn't sleighride on the road because the road was dry; didn't you? A. Yes."

With regard to the location of the sled at the time of the impact Marilyn testified: "Q. This (indicating) is the beginning of the sidewalk and this (indicating) is the wall. Would you say the sleigh was a little more than half way past the curb line? A. Yes. Q. Would you say half way or more than half way off? A. I would say more than half way off. Q. But at any rate some portion was on the sidewalk and some was more than half off? A. If it was half way off *some would have to be on the sidewalk.*" (Emphasis supplied.)

With this testimony that Alviena's sled was partly on the sidewalk, it was obvious error for the court to tell the jury that if they believed Marilyn's testimony, they had to find for the defendant. On this basis, the jury could conclude that the defendant had the right to cross the street and run down a helpless child astride her sled on the sidewalk. The mere utterance is enough to demonstrate the palpable fallacy of the judge's instruction.*

This reason in itself would be enough to warrant the ordering of a new trial, but there are other errors in the record which should be adverted to so that they may not be repeated when this case goes before another jury.

The defendant called to the witness stand the police chief of Honesdale and asked him if he had brought any criminal charges against the defendant Franc, the defendant's theory being that if the chief of police did

---

* The Vehicle Code of 1929, §1004 (75 PS §1004); *Polando v. Blue Ridge Transp. Co.*, 374 Pa. 485; *Mitchell v. Stolze*, 375 Pa. 296.

not prosecute Franc, this established that Franc was free of negligence. It is a theory which, like the airiest of bubbles, will burst at the first touch of logic and reason. There might be a hundred reasons why a chief of police in a small town would not criminally prosecute a certain individual, and this not be evidence of faultlessness on the part of that person. Moreover, the test in this case is not whether Franc acted in a criminal manner in running down Alviena Patton but whether he exercised due care under the circumstances.

Plaintiff's counsel properly objected to this testimony but he was overruled by the trial judge who later offered in support of his ruling the observation: "We feel that this evidence was admissible to corroborate the testimony of the chief of police and the defendant's testimony and to show that his investigation of the case, to which he testified, did not show any violation of the law."

The investigation to which the trial judge referred consisted simply of the chief asking the defendant how the accident happened. He did not even talk to Marilyn Smith, the eyewitness, whose testimony, according to the trial judge, was the controlling factor in the trial.

One of the cardinal rules of a trial is to keep it moving on the path of strict relevancy to the issue. It would not even be proper in a case of this kind to introduce a record of a plea of guilty arising out of the same occurrence in litigation. A fortiori, it is highly irregular to permit what amounts to merely one's opinion that the defendant committed no culpable act.*

---

* IV Wigmore on Evidence (3rd Ed.), Par. 1346a, pocket part, p. 165, citing: *Eggers v. Phillips Hardware Co.*, 88 So. 2d 507: "The principal issue here is whether the trial judge erred in admitting in evidence the testimony of the investigating officers that they did not arrest the defendant's employee for a violation of any of the city's traffic ordinances as a result of their investigation of the accident. We have concluded that this was error."

It would almost appear that defendant's counsel was determined to exhaust all possible errors in this trial so that a new trial could proceed from beginning to end without the slightest infraction of rules of procedure and substantive law. Counsel asked the defendant if he carried liability insurance. The defendant replied that he was insured to the extent of $25,000-$50,000. He was then asked: "And you had no financial responsibility then in the outcome of this case." And he replied: "None whatever."

This questioning was strictly irrelevant and incompetent and should not have been permitted.* The theory behind this testimony as advanced by the defendant and supported by the trial court is that since the defendant was insured he would have no reason to tell a falsehood because he did not stand to lose any money even if a verdict were returned against him. Without suggesting that the defendant may have told any untruths, it is obvious that there may be many strings to the bow of self-interest, aside from the one of pecuniary consideration. A defendant charged with negligent conduct in an automobile case may not want to lose the verdict out of fear that it may adversely affect his standing as a driver; he may apprehend that it may damage his reputation to have been found at fault for running down a child; he may want to win out of sheer vanity in being triumphant in a legal controversy. Moreover, it is not to be excluded that the loss of a lawsuit may still affect the defendant pecuniarily because of the possibility of increase in premium on future insurance policies. In any event, the introduction of the subject of insurance into the trial befogged the issue and should not be referred to in the next trial.

Finally, reaching for the ultimate in irrelevancy, defendant's counsel introduced evidence to show that

---

* *Finney v. G. C. Murphy Co.*, 400 Pa. 46.

the summons in trespass was dated February 10, 1958, and served on the defendant February 12, 1958. The accident occurred on January 18, 1958, the injured child suffered amnesia and did not recover her memory as to what happened until some five weeks later. The judge charged the jury: "As you will recall, Alviena and her parents both testified that she did not remember any of the details as to how the accident happened until at least from two to five weeks after she was out of the hospital and this law suit was started four days after she was out of the hospital before the witnesses testified they had any knowledge as to how it happened, and that goes to the credibility because, as we said here this morning, no one has a right to start a law suit unless he knows the cause of the action and you have no right to start a law suit unless you know how it happened, and this goes to the credibility of the parties."

This charge was highly prejudicial to the plaintiffs. It implied dishonesty and fraudulent conduct on the part of the father plaintiff without there being any evidence to support the implication. And then, it is not in accordance with the facts. There is nothing in the record to substantiate the judge's statement that the father plaintiff did not know what happened before the summons was issued and served. A George Keller testified that immediately after the accident he saw the child's body lying 3 feet from the curb. The defendant said to him: "I didn't see a thing." These facts in themselves, would be enough to justify the father of an injured child in initiating a lawsuit to protect his child's rights. And then, there was Marilyn Smith who had no amnesia and testified that Alviena's sled was partly on the sidewalk when she was hit. She was available for questioning before the father plaintiff began the lawsuit.

Defendant's counsel says in his brief: "Either she (Alviena) was guilty of exaggerating the extent of her injury, or much worse, Rendell Patton and Louis A. Fine, Esq., his attorney, were engaging in a highly unethical practice of instituting a legal action before they had knowledge of facts to justify the same."

This statement is wholly unwarranted by the known facts in the case. From what appears in the record, one could conclude that plaintiffs' counsel acted not only conscientiously but wisely and to the best interests of his clients in filing his lawsuit at once.

Reversed with a venire facias de novo.

Mr. Justice BELL concurs in the result.